## GREEN et al. v. THE STATE.

1. An indictment alleging that certain named persons "did in a violent and tumultuous manner prevent the sheriff . . from removing from the common jail" a prisoner therein confined, sufficiently charges the offense of riot, as against a special demurrer setting up that the indictment did "not allege any act done in a violent and tumultuous manner, which prevented" the sheriff from removing the prisoner. Aliter, if the point had been made that the act charged was not set forth with sufficient particularity.

2. Evidence warranting a finding that a number of persons, some of whom were armed with deadly weapons plainly exposed to view, suddenly congregated at a given signal for the purpose of preventing the removal of a prisoner from jail by the sheriff and his posse, acted in an excited manner, talked loudly, ran about from place to place, and made use of threatening, profane, and violent language, thereby intimidating the sheriff and his posse and actually preventing the removal of the prisoner until the arrival of military troops sent to his assistance, authorized the conviction of these persons of the offense of riot. All persons connected with and sharing in the common purpose of the assembly were guilty of riot, whether their conduct was violent and tumultuous or not.

3. The judge committed no error in charging, or in refusing to charge as requested. Such of the other grounds of the motion for a new trial as present questions in a manner that can be dealt with disclose no error requiring the granting of a new trial.

LUMPKIN, P. J., and FISH, J., dissenting. The special demurrer above referred to was intended to present, and did sufficiently present, the objection to the indictment that it did not set forth what means the accused employed, or what specific act or acts they did, for the purpose of preventing the removal of the prisoner, and therefore did not with the requisite particularity put the accused on notice of the charge they were called upon to meet. Thus interpreted, the demurrer was good and ought to have been sustained.

Argued December 4, 1899. — Decided January 26, 1900.

Indictment for riot. Before Judge Seabrook. McIntosh superior court. November 2, 1899.

*Twiggs & Oliver, Alexander A. Lawrence, R. L. Colding,* and *R. L. Travis,* for plaintiffs in error.    *Livingston Kenan, solicitor-general, Walter G. Charlton,* and *Walter C. Hartridge,* contra.

Cobb, J.  Jonas Green, Moses Miller Jr., Lawrence Baker, and a number of others were arraigned in the superior court of McIntosh county, on an indictment containing two counts, each of which charged the commission of the offense of riot. The first count charged that these persons, on a day named, " having a common cause of quarrel, did violently and tumultuously commit an unlawful act of violence, by preventing the sheriff of said county from removing from the common jail of said county one Henry Delegal, a prisoner therein under the laws of Georgia, to the terror of the people and contrary to the laws of said State," etc.  The second count charged that the persons named in the indictment, "with a common cause of quarrel, did in a violent and tumultuous manner prevent the sheriff of McIntosh county from removing from the common jail of said county one Henry Delegal, therein confined under the laws of Georgia."  The accused filed demurrers, both general and special, to the indictment, the special demurrers being as follows: (1) The indictment does not set forth or describe in the first count thereof any unlawful act of violence which prevented the sheriff from removing Delegal from the common jail of McIntosh county.  (2) The indictment does not in the second count thereof allege any act done in a violent and tumultuous manner which prevented the sheriff from removing the prisoner.  The demurrers were overruled, and exception was duly taken to this ruling.  After evidence was introduced, the jury returned a verdict of guilty as to Green, Miller, and Baker, who had elected to sever from the others and were tried jointly.  They made a motion for a new trial, which was overruled, and they excepted.  It appears from the evidence that the sheriff of McIntosh county and his posse attempted to remove Henry Delegal, a prisoner, from jail and carry him to Savannah.  About the time this attempt was being made a church bell was rung, at which signal a crowd of persons, variously estimated at from 75 to 250, among whom were the plaintiffs in error, began suddenly and rapidly to congregate.  The members of the crowd ran about from place to place, cursing and talking loudly and in an excited manner.  A number of them were armed with deadly weapons plainly exposed to view.

Some members of the crowd were heard to make use of threatening and violent language; one remarking that the sheriff and his assistants were going to remove Delegal to Savannah, and that he was going to "see about it." Another was heard to remark, upon the arrival of troops sent to quell the disturbance, that "they are working a new trick on us; get to your arms." Another said "she would be the first to throw a couple of shots among the white sons of bitches." And still another said that "they intended to kill out all the white people in town." The crowd, however, made no hostile demonstration toward the sheriff or his posse; but, as he testifies, he was prevented by their conduct from removing the prisoner until later on when he was enabled to accomplish this purpose with the aid of troops which were sent to his assistance. It is evident from the testimony that the crowd was in an ugly frame of mind, and that it needed but little to stir them into the commission of open acts of violence and most probably bloodshed. The evidence shows that the plaintiffs in error were connected with the other members of the crowd and shared in their common purpose, and that all of them were armed.

1. The section of the code dealing with the subject of riot is in the following language: · "If two or more persons do an unlawful act of violence, or any other act in a violent and tumultuous manner, they shall be guilty of a riot, and be punished as for a misdemeanor." Penal Code, § 354. Riot at common law is defined by Sir William Blackstone as follows: "A riot is where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel; . . or do any other unlawful act with force or violence; or even do a lawful act . . in a violent and tumultuous manner." 4 Bl. Com. 147. The only material difference between the two definitions seems to be, that at common law the offense could not be committed by less than three persons, and under our statute it can be committed by two. The words "with or without a common cause or quarrel" were originally in the code definition. See Code of 1882, § 4514. But these words were omitted from the Code of 1895. Their omission does not materially change the definition of the offense, and therefore, in substance, it remains

the same as it was at common law. The section of the code above quoted embraces two separate and distinct classes of riot; the first being when "an unlawful act of violence" is commits ted; and the second when two or more persons commit "any other act in a violent and tumultuous manner." Under the view we take of the present case it is unnecessary to determine whether, as against the demurrer filed in the present case, the first count in the indictment sufficiently charges the commis-ion of an unlawful act of violence. See in this connection, however, Regina v. Gulston, 2 Ld. Raym. 1210; Bonneville v. State, 53 Wis. 680; State v. Brazil, Rice's Rep. (S. C.) 257; State v. Dillard, 5 Black. 365, s. c. 35 Am. Dec. 128.

An examination of the evidence in this case has satisfied us, as will be shown hereafter, that it was sufficient to authorize the conviction of the persons on trial of that class of riot which is brought about by the commission of some act in a violent and tumultuous manner. It is necessary, therefore, to determine whether the second count in the indictment, which attempts to charge such an offense, was a sufficient indictment as against the demurrer which was filed to the same. The indictment charges that the persons accused, with others, " did in a violent and tumultuous manner prevent the sheriff" from removing a certain named person from the common jail of the county, who was lawfully confined therein. The special demurrer makes the objection that this count does not "allege any act done in a violent and tumultuous manner which prevented " the sheriff from removing the prisoner. The question which the demur-rer raises is, whether the words in the indictment charge that an act within the meaning of the Penal Code was done by the persons named therein. The demurrer does not raise the ques-tion as to whether, conceding such an act to be charged, it is set forth and described with that definiteness which good plead-ing requires and which would be necessary to put the persons accused on notice as to the exact details of the act which they are charged with having committed, either as to place or man-ner. What is meant by preventing? Prevent is defined as, to intercept; to hinder; to frustrate; to stop; to thwart. Web-ster's International Dictionary. To hinder from happening,

by means of previous measures; keep from occurring or being brought about as an event or result; ward off; preclude; hinder, as to prevent the escape of a prisoner. To stop in advance, as a person or thing from some act or operation; intercept or bar the action of; check; restrain. Standard Dictionary. An act is defined as "that which is done or doing; the exercise of power or the effect of which power exerted is the cause; a performance; a deed." Webster. "Something done or established." Bouvier. From these definitions it is impossible to come to any other conclusion than that a statement to the effect that one person was prevented from doing something by the conduct of another person embraces the idea that the latter person necessarily committed an act of some character. This being true, when the indictment alleged that the persons accused prevented the sheriff from removing a prisoner from jail, it alleged that such persons had committed an act; and therefore the demurrer, which simply raised the point that the indictment did not charge that an act had been committed, was not well taken. As the indictment charged that an act was done in a violent and tumultuous manner, it was sufficient as against a general demurrer and also as against the special demurrer which was filed to the same. We do not mean to say that this indictment is by any means perfect, or that a special demurrer raising the question as to whether the act alleged should not be described with greater particularity would not have been well taken; but we are clear that as against the demurrers filed to the same the indictment was sufficient, and that there was no error in overruling the demurrers. It is a well-settled rule in this State, that the language of an indictment is to be interpreted liberally in favor of the State. Penal Code, § 929; *Studstill* v. *State*, 7 *Ga.* 2, 16. It follows necessarily from this, that a demurrer raising special objections to an indictment should be strictly construed against the pleader.

2. The evidence establishes that a number of persons assembled together, some of them being armed with deadly weapons; that the expressed purpose for which they assembled was to prevent an arresting officer from removing a prisoner from jail; that they did prevent him from doing so until the arrival of the

military, which overawed the assemblage and aided the sheriff in removing the prisoner. The evidence further discloses the use of threatening language on the part of some members of the crowd, indicating a purpose to resort to the most extreme measures, even to bloodshed, to prevent the prisoner being removed; that the members of the crowd assembled at a given signal, the ringing of a bell, showing that the movement must have been preconcerted; this purpose being further manifested by the fact that some of the members of the crowd left their occupations and came from various quarters of the town in response to the ringing of the bell. Do these facts make out the offense of riot as defined by our code, which definition, as we have seen, is not materially different from that of the common law? A consideration of the adjudicated cases will demonstrate that the conduct of the persons accused in the present case was of such a character as to warrant their conviction for riot. The exact question to be ascertained, as will have been gathered from the above recitals, is whether an assemblage of persons who commit no overt act of violence, but still do some other act in such a way that it is calculated to bring about a breach of the peace or terrify the people, are guilty of the offense of riot. Conceding that neither the indictment nor the evidence authorized a conviction for that class of riot which is committed by the doing of an unlawful act of violence, we shall endeavor to show that the evidence in the present case authorized a conviction under the second count in the indictment. To sustain a conviction under that count, it is not necessary to show that the act done was unlawful. *Carnes* v. *State*, 28 *Ga.* 192. In the case of *Jacobs* v. *State*, 20 *Ga.* 841, that portion of the opinion of Lumpkin, J., which deals with the subject of riot is obiter, but any opinion expressed by that able jurist is valuable in arriving at a proper conclusion. There the evidence did not show that any of the defendants struck the prosecutor, but it did show that they threatened to whip him, and otherwise acted in a violent and tumultuous manner. They, however, committed no specific act of violence. Judge Lumpkin was of opinion that the defendants could have been convicted under the second branch of the definition of riot; saying that "their conduct was violent, tumultuous, and cer-

tainly unjustifiable, if not unlawful." In *Barron* v. *State*, 74 *Ga*. 833, it was held that evidence would not warrant a conviction for riot which showed merely that "though their conduct may have been tumultuous, it was not violent." The use of the word "conduct" in the two foregoing quotations is significant as showing that under the second branch of the definition of the offense of riot the gist of the offense is the character of the conduct of the persons charged with the offense. In the case of *Sanders* v. *State*, 60 *Ga*. 126, the defendants convicted, with others, assembled at a certain house, all being armed. They were in search of some one, though they had no warrant for his apprehension. The owner of the house, seeing they were bound to come in, invited them to enter and join the family at breakfast. They did so, and behaved rudely at the table. The man of the house was frightened, and tried to pacify them. He had before this made a fire for them in the yard, and on account of their boisterous manner had offered to aid them in their search. The court expressed the opinion that the facts made a weak case of riot, and in this opinion we share; but it can not be seriously contended that the facts of the present case do not make a much stronger case of riot. The cases of *Bolden* v. *State*, 64 *Ga*. 361, and *Fisher* v. *State*, 78 *Ga*. 258, were dealing with the offense of riot as defined in the first part of the section of the Penal Code above quoted; and hence the court properly addressed itself to the question as to whether or not an unlawful act of violence was committed. There is nothing in those cases which could be construed as authority for the proposition that violent and tumultuous conduct, such as threats, the exhibition of arms, menacing gestures, and the like, by means of which a desired object was accomplished, would not constitute riot under the second branch of the definition of that offense.

From 1 Hawk. 515, § 5, we quote the following: "However, it seems to be clearly agreed, that in every riot there must be some such circumstances either of actual force or violence, or at least of an apparent tendency thereto, as are naturally apt to strike a terror into the people; as the shew of armor, threatening speeches, or turbulent gestures." It would follow from this that if these things were done, or similar things calculated to terrify the people, the offense would be made out. In the

case of Clifford *v.* Brandon, 2 Camp. 358, it was held that "if a number of persons, having come to the theatre with a predetermined purpose of interrupting the performance, for this purpose make a great noise and disturbance, so as to render the actors entirely inaudible, though without offering personal violence to any individual, or doing any injury to the house, they are, in point of law, guilty of a riot." In State *v.* Jackson, 1 Spear (S. C.), 13, it was held that the possession of a club, and the use of threatening language, constituted such a show of force as would make out the offense of riot. In the case of Com. *v.* Runnels, 10 Mass. 518, it was ruled that, "if the offense consists in going about armed without committing any act, the words 'in terrorem populi'" should be alleged in the indictment; and it was said, in the opinion, that, "To disturb another in the enjoyment of a lawful right is a trespass; and if it is done by numbers unlawfully combined, the same act is a riot." Under the Indiana statute the commission of an "act in a violent and tumultuous manner" by three or more persons is riot. In State *v.* Brown, 69 Ind. 95, s. c. 35 Am. Rep. 210, it was held that "persons conducting a charivari, or serenade with bells, horns, tin pans, guns, etc., are guilty of a riot." In this case the evidence did not show the commission of any specific act of violence, but showed merely general conduct of a violent and tumultuous nature. In Bankus *v.* State, 4 Ind. 114, it was held that where several persons marched back and forth along a highway, blowing a horn and singing songs and hallooing, they were guilty of riot under a statute declaring that a lawful act done in a violent and tumultuous manner is riot. The court said that they regarded the case as a plain but not an aggravated case of riot. In State *v.* Acra, 2 Ind. App. 384, it was ruled that an indictment which alleged that three persons did, in a riotous, violent, and tumultuous manner, unlawfully attempt to commit a violent injury on the person named, by violently and unlawfully threatening to beat, cut, and shoot such person, stated facts which sufficiently charged the offense of riot. In the old case of Queen *v.* Soley, 11 Modern, 115, Lord Holt says that, "if a number of men assemble with arms, in terrorem populi, though no act is done, it is a riot." Citing Howard *v.* Bell, Hob. 91.

Also, "if three men come out of an ale-house and go armed, it is a riot." Citing Year Book 3 Hen. 7, pl. 1. See also 2 Bish. New Crim. L. § 1147; 2 Whart. Crim. L. (10th ed.) § 1540; Clark's Crim. Law, 342; 1 Russ. Cr. 555; 2 Arch. Cr. Pl. & Pr. § 588 (h. 1); Hochheimer's Law of Crimes and Crim. Proc. § 796; May's Crim. Law, § 204; Desty's Crim. Law, § 98 (a). From these authorities we think the principle is plainly deducible, that if a number of persons assemble to prevent an arresting officer from removing a prisoner, and do actually prevent him by intimidation arising from the possession of arms and the use of threats to shoot and kill, it is a riot and an aggravated one at that, though no specific act of violence be committed. This is such violent and tumultuous conduct as amounts to a breach of the peace and is calculated to terrify the people; and hence it can be properly denominated riot.

That the plaintiffs in error could have been convicted, though they had no arms and used no threats, if they were in fact members of the assembly and shared in the common purpose, is well settled by the authorities. Clifford v. Brandon, 2 Camp. 358; King v. Hunt, 1 Keny. Notes of Cas. 108; State v. Straw, 33 Me. 554; Williams v. State, 9 Mo. 270; 2 Bish. New Cr. L. § 1153. See also the notes to the case of State v. Jenkins, 94 Am. D. 138. The evidence amply warranted a conviction under the second count in the indictment.

3. The motion for a new trial contained various grounds. Those complaining of the refusal of the court to charge certain requests are without merit, for the reason that all of the requests contained propositions which either were not sound law or not adjusted to the facts of the case. Portions of the charge of the judge which were excepted to were substantially in accordance with what is above ruled. The remaining grounds of the motion complain of errors alleged to have been committed in admitting evidence. In three of these grounds the evidence objected to is not set forth, but reference is made to the brief of evidence to ascertain what was the evidence objected to. According to repeated rulings of this court, such grounds will not be considered. Three of the grounds set forth the evidence objected to. This evidence consisted of declarations made by persons in the crowd, other than those on trial. Objection

was made to this evidence on the ground that it was irrelevant and that the declarations were made after the sheriff had abandoned his intention of removing Delegal from jail. It is not necessary to cite authority to establish the proposition, that all persons who compose a riotous assembly are bound by every declaration made by any member of that assembly as long as such assembly continues. The evidence in this case shows that the riotous assembly commenced at the ringing of a bell in the forenoon and continued practically throughout the day; and therefore declarations made by the rioters at any time during the day would, under the principle above referred to, be admissible in evidence against the others. The fact that the riot in the forenoon had taken such shape that the sheriff had determined not to risk removing the prisoner would not render inadmissible declarations made after he had come to this determination, which were calculated in their nature to throw light upon the motive and intention of the assembly at some previous period of the day.

　　　　*Judgment affirmed.　All the Justices concurring, except* Lumpkin, P. J., and Fish, J., dissenting. The only point of difference between ourselves and the majority is, whether or not the demurrer properly raises the objection that the indictment fails to set forth the offense with that degree of certainty which the law requires. We all agree that, as against a demurrer itself sufficient in the respect indicated, the indictment would not be good. The single question at issue should therefore be determined by ascertaining the true intent and meaning of the language used in the demurrer. We of the minority do not think its purpose was merely to set up that the indictment charged no act at all. If we entertained this view, we would not hesitate to concur in the conclusion reached by our brethren; but we do not believe they have given to that language its correct interpretation. Had the words employed in the demurrer simply been that the indictment did "not allege any act done in a violent and tumultuous manner," there would be much force in the position that the sole point of objection was as above stated; but the addition of the words "which prevented" throws a clear and strong light upon the pleader's intention. Giving to the words last quoted the only signification

they could reasonably have been designed to have, the true meaning of the demurrer is that which would be conveyed by the words, "the indictment fails to allege that any act was done by which the sheriff was prevented from removing the prisoner," and this would be the equivalent of saying that the indictment does not set forth the particular act or acts, or specify the means, by which the prevention in question was accomplished. We entertain no doubt that this was the objection to the indictment which the demurrer was intended to present, and we think it did present it with sufficient clearness. In other words, we are of the opinion that the point is well made that the act charged in the indictment, viz. prevention, "was not set forth with sufficient particularity." While a charge that a person was prevented from doing a designated thing is, in one sense, undoubtedly the expression of a mere conclusion, we cheerfully grant that, in another sense, prevention is properly termed "an act." However, it is an act which can be done in many and very different ways. This is certainly true of the particular act of prevention charged in the present case, and therefore, if the accused properly demanded specific information as to the kind of prevention with which they were charged, they were entitled to have it. As to the doctrine announced in the last sentence we are all of one faith. It is only in the application of it that we divide, two of us going to the right and the remaining four to the left.